72 F.3d 1075
 64 USLW 2426, 49 Soc.Sec.Rep.Ser. 716,
Medicare & Medicaid Guide P 43,961
 Evelyn BLUE, d/b/a New Paltz Nursing Home, Plaintiff-Appellee,
v.
Mary Jane KOREN, M.D.; K. Michele Dulemba; Patricia
Cooney, R.N.; Barbara E. Brooks, R.N.; Barbara
Rosenfield; and Mykola Lawrynenko,
Defendants-Appellants.
 No. 1566, Docket 94-9169.
 United States Court of Appeals,
Second Circuit.
 Argued July 17, 1995.
Decided Dec. 26, 1995.
 
 Susan L. Watson, New York City (Dennis C. Vacco, Attorney General of the State of New York, Kathie Ann Whipple, Acting Bureau Chief, Litigation Bureau, Michael S. Popkin, Assistant Attorney General, of counsel), for Defendants-Appellants.
 Bradley L. Kelly, Washington, DC (Donald L. Bell, II, Washington, D.C., Proskauer Rose Goetz & Mendelson LLP, Washington, DC, of counsel), for Plaintiff-Appellee.
 Before: WINTER, CALABRESI and CABRANES, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Various current and former employees of the New York State Department of Health (collectively "DOH") appeal from Judge Goettel's denial of their motion for summary judgment based in part on an assertion of qualified immunity. The appeal raises important questions concerning the constitutional rights of nursing home operators to limit inspections of their facilities by government health officials.
 
 
 2
 DOH is responsible for conducting inspections of nursing homes to insure compliance with pertinent state and federal regulations. Evelyn Blue d/b/a New Paltz Nursing Home ("New Paltz") brought this action under 42 U.S.C. Sec. 1983, alleging that DOH violated its constitutional rights by conducting unreasonable, duplicative and retaliatory inspections of New Paltz. DOH claims that it is entitled to qualified immunity from this action. We conclude that the inspections were not unconstitutionally unreasonable or duplicative. We also conclude that appellees have qualified immunity from the retaliation claim. We therefore reverse.BACKGROUND
 
 
 3
 New Paltz is a seventy-nine bed nursing home located in New York state. As a participant in federal Medicare and Medicaid programs, it is subject to periodic inspections to insure compliance with Medicare and Medicaid regulations. DOH conducts these inspections, styled "certification surveys," on behalf of the federal Health Care Financing Administration ("HCFA"), a division of the Department of Health and Human Services.
 
 
 4
 In 1987, Congress passed the Federal Nursing Home Reform Act ("FNHRA"), contained in the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100-203, Secs. 4201-4218, 1987 U.S.C.C.A.N. (101 Stat.) 1330, 1330-160 to -221 (codified at 42 U.S.C. Secs. 1395i-3, 1396r), which provides for the elaborate oversight and inspection of nursing homes that participate in Medicare and Medicaid programs. FNHRA requires that New Paltz, a participant in these programs, be subjected to an unannounced "standard survey" at least once every fifteen months. 42 U.S.C. Sec. 1395i-3(g)(2)(A). If a standard survey reveals that a nursing home is providing substandard care, the facility must undergo an "extended survey." 42 U.S.C. Sec. 1395i-3(g)(2)(B). In addition, "[a]ny other facility may, at the Secretary [of Health and Human Services'] or State's discretion, be subject to such an extended survey (or partial extended survey)." Id. Under survey guidelines authored by HCFA, the "survey team is not precluded from gathering information related to any requirement during the course of the Standard, Extended, or Partial Extended Surveys." Survey Protocol for Long Term Care Facilities, State Operations Manual, Appendix P (hereinafter "Survey Protocol") at 32. The requirements for certification include meeting certain standards in areas such as "quality of care" and "resident rights." 42 U.S.C. Secs. 1395i-3(g), 1396r(g); Survey Protocol, Task 5, at 12-26.
 
 
 5
 Underlying New Paltz's action is a claim that DOH conducted certain surveys in an oppressive fashion in order to retaliate against New Paltz for DOH's loss of a prior enforcement proceeding brought against New Paltz under the New York Public Health Law. In that proceeding, DOH had charged that New Paltz had violated state regulations with its use of naso-gastric tube feeding. The tube-feeding procedure involves insertion of a wide-bore (5-9 mm) tube through a patient's nose or mouth for one to three minutes for the purpose of feeding. DOH considered this practice medically unsound. Nevertheless, in a report dated June 8, 1990, a state administrative law judge ("ALJ") upheld the tube-feeding procedure.
 
 
 6
 In August 1990, before the ALJ's findings had become final, DOH conducted a survey of New Paltz. New Paltz describes that survey as a "favorable survey," and it is not challenged in the instant suit. On October 9, 1990, the ALJ's findings upholding the tube-feeding procedure became final when the Commissioner of Health formally adopted them. See 10 N.Y.C.R.R. Sec. 51.13. Thereafter, in February 1991, DOH conducted a survey as a "follow-up" to the August 1990 survey. The "follow-up" survey is also unchallenged in the instant suit.
 
 
 7
 In September 1991, DOH conducted a standard survey of New Paltz. The FNHRA and regulations promulgated thereunder had become effective after the 1990 surveys, and this was thus the first survey under the new federal regulatory regime. Five to six surveyors visited New Paltz over the course of five days, for a total of 28 or 29 surveyor days. New Paltz notes that the previous annual survey entailed only twelve surveyor days and that in the September 1991 survey DOH examined almost every patient, instead of a sample as suggested by federal guidelines. DOH thereafter conducted an extended survey of New Paltz on September 27 and 30, 1991, with two surveyors on site each day. Based on these surveys, DOH made numerous negative findings and cited New Paltz with several severe or "Level A" deficiencies, as well as several less serious or "Level B" deficiencies. Level A deficiencies can lead to termination of a nursing home's certification to participate in the Medicare and Medicaid programs.
 
 
 8
 In December 1991, DOH made an "interim visit" to determine whether the Level A deficiencies had been corrected. It found that they had not. As a result, HCFA took steps to terminate New Paltz's participation in the Medicare and Medicaid programs. The action to decertify New Paltz for Medicare and Medicaid purposes was abated after a January 1992 "Credible Allegation" survey determined that sufficient remedial actions had been taken to insure compliance with the Level A requirements.
 
 
 9
 In September 1992, New Paltz brought the present action against DOH, alleging in its complaint that the surveys undertaken between September 1991 and January 1992 (collectively the "1991 surveys") were excessive in duration and scope and deviated from the procedures prescribed in federal guidelines. New Paltz claimed that the 1991 surveys constituted an unreasonable search in violation of the Fourth Amendment, a duplicative prosecution of the tube feeding issue, and retaliatory harassment for New Paltz's victory in the tube-feeding proceeding in violation of federal due process. DOH moved for summary judgment, contending that it had not violated New Paltz's constitutional rights and that, in any event, the individual appellants were entitled to qualified immunity. The district court denied the motion except with respect to a ground abandoned here, and DOH appealed.[1]
 
 DISCUSSION
 
 10
 Public officials are entitled to immunity from damage actions "insofar as their conduct [did] not violate clearly established ... constitutional rights." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). However, in Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), the Supreme Court also stated, "a necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is ... whether the plaintiff has asserted a violation of a constitutional right at all." Thus, the Court held that a threshold inquiry in analyzing an assertion of qualified immunity is whether the plaintiff has alleged a constitutional violation. Id. at 232, 111 S.Ct. at 1793. We conclude that there has been no constitutional violation in the present matter with regard to the Fourth Amendment or due process duplicative prosecution claim. A due process violation is alleged as to the retaliation claim but appellees have qualified immunity.
 
 A. Unreasonable Search Claim
 
 11
 In holding that DOH was not entitled to qualified immunity with respect to New Paltz's Fourth Amendment claim, the district court stated in general terms that the reasonableness of the 1991 surveys was a disputed issue to be resolved only by a trial. We disagree.
 
 
 12
 Whether a warrantless inspection or search of commercial premises is reasonable turns on: (i) whether there is a "substantial government interest" that informs the regulatory scheme underlying the inspection or search; (ii) whether the inspection or search is necessary to further the regulatory scheme; and (iii) whether the scheme provides a substitute for a warrant by alerting the owner to the likelihood of such inspections and by limiting the discretion of the inspecting officials. New York v. Burger, 482 U.S. 691, 702-03, 107 S.Ct. 2636, 2644-45, 96 L.Ed.2d 601 (1987).
 
 
 13
 With regard to the substantiality of the government interest in the state and federal regulation of nursing homes, it can hardly be doubted that the interest is of the highest order. Many patients at nursing homes are helpless, and their physical and mental well-being and quality of life are often at the mercy of the operators and staff. New Paltz wisely does not argue otherwise. Also wisely, New Paltz does not argue that warrantless inspections are unnecessary to implementation of the regulatory scheme. Mistreated patients may find it difficult or impossible to contact regulatory officials or to rebut denials by the operator or staff regarding conditions of care. Unannounced, on-site inspections are thus essential to the regulatory scheme.
 
 
 14
 In Burger, the Supreme Court upheld a New York law allowing unannounced, warrantless, on-site inspections of vehicle dismantlers in light of the nexus between widespread automobile theft and the dismantling industry. The Court noted that the expectation of privacy is "particularly attenuated" in industries that are "closely regulated." 482 U.S. at 700, 107 S.Ct. at 2642. Turning to the present case, the government interest in the regulation of nursing homes and the need for warrantless searches is clearly of a different and higher order than is found in the vehicle dismantling industry. We believe that nursing homes' right of privacy with regard to matters related to their compliance with patient care rules and regulations is even less than "attenuated." It is virtually non-existent.
 
 
 15
 New Paltz's Fourth Amendment claim is thus limited to allegations that the challenged surveys were outside the discretion of DOH because they exceeded the scope of the survey regulations. However, New Paltz has shown no more than that the 1991 surveys exceeded minimum required levels of scrutiny. The statutory scheme and the HCFA Guidelines place no limit on the intensity or rigor with which DOH may conduct surveys. Indeed, they give inspectors broad leeway, stating that any facility may be subject to a discretionary extended survey, see 42 U.S.C. Sec. 1395i-3(g)(2)(B), and that the survey team may gather information related to "any requirement" for certification, Survey Protocol at 32. Nursing homes have no constitutional right to limit scrutiny of patient care to minimum levels.
 
 
 16
 Given the breadth of the matters covered by the regulations--from medical care and physical safety to quality of life and patient dignity--inspections of nursing homes do not violate the Fourth Amendment so long as the inspections are: (i) related to patient care defined in the broadest sense, (ii) do not intrude in areas unrelated to patient care and in which the owner or operator has an expectation of privacy, and (iii) do not interfere with the operation of the facility in ways that are demonstrably unrelated to the legitimate purposes of the inspection.[2] There is no allegation or proffer of evidence in the present case that even remotely suggests a valid Fourth Amendment claim under this test.
 
 
 17
 New Paltz argues that DOH conducted the surveys with the intent to punish New Paltz for the disputed tube-feeding practices, and that this improper motive rendered the search unreasonable. However, DOH's motive is irrelevant, because a Fourth Amendment claim must be based on a showing that the search in question was objectively unreasonable. See Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). An improper motive does not create an expectation of privacy where none exists. The claim is better framed as one for government harassment in retaliation for the exercise of a constitutional right and thus sounds in due process. Indeed, retaliation claims generally are better treated under due process analysis because the pertinent conduct of the officials can be scrutinized as a whole, rather than in the piecemeal, compartmentalized fashion necessary under more specific constitutional provisions. We thus deal with the retaliation claim infra.
 
 B. Duplicative Prosecution Claim
 
 18
 New Paltz's duplicative prosecution-due process claim alleges that the 1991 surveys were undertaken to revisit the use of naso-gastric tube-feeding that was litigated in the 1989-90 enforcement proceeding.
 
 
 19
 We will assume that repeated and duplicative administrative proceedings may offend due process. However, a duplicative proceeding claim against an otherwise legitimate inspection must be based on a showing that the inspection substantially overlaps the matter involved in the previous administrative proceeding and without any legitimate chance of uncovering a violation of pertinent rule or regulation.
 
 
 20
 The cases relied upon by New Paltz and the district court all require far more in the way of duplication than occurred in the instant matter. Those decisions involved repeated litigation of the identical noise control issue under one set of regulations, see Continental Can Co. v. Marshall, 603 F.2d 590 (7th Cir.1979), or multiple prosecutions of virtually identical criminal cases, see United States v. American Honda Motor Co., 273 F.Supp. 810 (N.D.Ill.1967) (concerning prosecutions for conspiracy in restraint of trade in four different forums); PHE, Inc. v. United States Dep't of Justice, 743 F.Supp. 15 (D.D.C.1990) (concerning multiple prosecutions of one business for distributing allegedly obscene materials).
 
 
 21
 The challenged surveys clearly implicated far more than tube-feeding, and the deficiencies asserted during the surveys were broader than the issue litigated in the administrative enforcement proceeding. Moreover, the surveys were in large part mandated by law, see 42 U.S.C. Sec. 1395i-(3)(g)(2)(A) (requiring standard surveys at least once every fifteen months).
 
 
 22
 Moreover, the adjudication in a state proceeding that naso-gastric tube-feeding is lawful under state regulations did not shield New Paltz's use of this practice from inspection under FNHRA regulations. Indeed, it would be a questionable act for an inspector to neglect to scrutinize such a practice in light of federal guidelines that, as New Paltz concedes, have consistently called for close scrutiny of resident care needs.
 
 C. Retaliation Claim
 
 23
 In order to state a valid due process claim for retaliation, a plaintiff must allege that he or she engaged in conduct that was constitutionally protected and that retaliation against the protected conduct was a "substantial" or "motivating" factor in the defendant's actions. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). New Paltz claims that the 1991 surveys were undertaken in retaliation for the exercise of its First Amendment right to petition the government. New Paltz alleges that DOH retaliated against it for New Paltz's exercise of what is a clearly established constitutional right.[3] However, as our discussion of the Fourth Amendment and duplicative prosecution claims demonstrates, appellees' conduct was objectively reasonable, and New Paltz has not provided legally sufficient evidence of retaliatory motive to survive a motion for summary judgment based on the defense of qualified immunity.
 
 
 24
 Where, as here, a constitutional claim contains a subjective component, many courts have imposed on plaintiffs what they describe as a heightened standard, requiring them to provide specific allegations or direct evidence of the required state of mind in order to avoid summary judgment based on the defense of qualified immunity. See Siegert v. Gilley, 500 U.S. 226, 235-36, 111 S.Ct. 1789, 1795-96, 114 L.Ed.2d 277 (1991) (Kennedy, J., concurring); Martin v. D.C. Metropolitan Police Department, 812 F.2d 1425, 1432-35 (D.C.Cir.1987). We agree with this approach, although, for reasons discussed below, we are doubtful that it imposes a burden greater than is already required under Fed.R.Civ.P. 56.[4]
 
 
 25
 The so-called heightened standard has been applied to address the problem of applying the test of "objective reasonableness" prescribed in Harlow, 457 U.S. at 819, 102 S.Ct. at 2738, in circumstances where the constitutional claim asserted contains a subjective component. As noted by the D.C. Circuit in Martin, 812 F.2d at 1432, "[t]he 'clearly established law' and 'objective reasonableness' facets of current qualified immunity doctrine tug in opposite directions where, as here, the 'clearly established law' itself contains a subjective component." By imposing that standard, courts have sought to reconcile the goal that led to the adoption of the objective test--permitting the dismissal of insubstantial claims involving objectively reasonable official conduct--with the goal of allowing plaintiffs to present claims that depend upon proof of unconstitutional motive. We believe that imposition of a similar standard is an appropriate way to accommodate these competing interests.[5]
 
 
 26
 In Martin, the District of Columbia Circuit adopted a heightened standard that requires plaintiffs to adduce "some direct evidence that the officials' actions were improperly motivated." 812 F.2d at 1435; see also Poe v. Haydon, 853 F.2d 418, 432 (6th Cir.1988) (adopting direct evidence standard), cert. denied, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). Other circuits have followed the approach advocated in Justice Kennedy's concurrence in Siegert, requiring a plaintiff to establish subjective intent with "specific, nonconclusory factual allegations," but noting that "[c]ircumstantial evidence may be as probative as testimonial [or direct] evidence." See Siegert, 500 U.S. at 236, 111 S.Ct. at 1795; Tompkins v. Vickers, 26 F.3d 603, 608 (5th Cir.1994); Branch v. Tunnell, 937 F.2d 1382, 1387 (9th Cir.1991); Elliott v. Thomas, 937 F.2d 338, 345 (7th Cir.1991), cert. denied, 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992); Pueblo Neighborhood Health Ctrs. v. Losavio, 847 F.2d 642, 649 (10th Cir.1988).
 
 
 27
 We agree that plaintiffs must offer specific evidence of improper motivation, but confess considerable doubt as to whether the "heightened" standard is really heightened or is simply an application of the rule that conclusory assertions are insufficient to defeat a motion for summary judgment. See Fletcher v. Atex, 68 F.3d 1451, at 1455 (2d Cir.1995). When such a motion is based on assertion of qualified immunity, the first issue is whether a clearly established right is at stake. See Siegert, 500 U.S. at 232, 111 S.Ct. at 1793. If it is, the court must then address whether the conduct was objectively reasonable. If not, the motion must be denied. If the conduct was objectively reasonable, a conclusory proffer of an unconstitutional motive should not defeat the motion for summary judgment. The reasonableness of the conduct is itself substantial evidence in support of the motion and requires in response a particularized proffer of evidence of unconstitutional motive. Otherwise, the qualified immunity defense would be hollow indeed. Officials, who may in the course of carrying out their duties have continuing run-ins with those whose conduct the officials must monitor, will be forced to go to trial when the only evidence of unconstitutional motive may be a prior dispute with the plaintiff, if that.
 
 
 28
 Accordingly, whether the description heightened is accurate or not, we hold: upon a motion for summary judgment asserting a qualified immunity defense in an action in which an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must proffer particularized evidence of direct or circumstantial facts, as suggested in Justice Kennedy's concurrence in Siegert, 500 U.S. at 236, 111 S.Ct. at 1795, supporting the claim of an improper motive in order to avoid summary judgment. In our view, the particularized evidence of improper motive may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken. New Paltz's evidentiary proffer falls woefully short of these requirements.[6]
 
 
 29
 New Paltz alleges no particularized statements by state officials indicating a retaliatory motive. New Paltz relies upon the temporal sequence of events, the rigor of the surveys, and the content of some of the deficiency findings as circumstantial evidence supporting its claim. With regard to the sequence of events, the ALJ's approval of New Paltz's practice of tube-feeding was made in June 1990 and adopted by the Commissioner in October 1990. However, New Paltz does not challenge the propriety of the August 1990 survey that followed the ALJ's ruling or the February 1991 survey that followed the Commissioner's adoption of that ruling. The challenged surveys were commenced only in September 1991, thirteen months after the previous survey of New Paltz and eleven months after the conclusion of the enforcement proceeding. Moreover, the timing of the 1991 surveys was to a significant extent determined by the federal regulations requiring DOH to conduct a standard survey at least once every fifteen months. The intervening "favorable" survey, the eleven months that elapsed between the enforcement proceeding and the 1991 surveys, and the introduction of new federal regulations totally undercut any causal relationship between the events.
 
 
 30
 Moreover, we reject the argument that the rigor of the surveys provides proof that DOH was motivated by a desire to retaliate against New Paltz for its victory in the tube-feeding proceeding. Nursing homes are a highly regulated industry, and some tension between operators of homes and regulators is to be expected, as are occasional adversary proceedings. We do not believe that a showing that a rigorous inspection followed a nursing home's victory in an administrative proceeding is a sufficiently particularized showing of improper motive. While such a temporal sequence may fuel a nursing home operator's suspicions, it does not suffice to satisfy the heightened evidentiary standard. Damage actions have collateral effects upon regulators that may impact negatively upon the beneficiaries of the regulation, here some of our most helpless citizens. If a defeat in an administrative proceeding were to be the basis for a damage action brought because of unrelated and otherwise lawful regulatory actions--here mandatory inspections--the regulatory scheme might well be undermined.
 
 
 31
 We also reject any contention that retaliatory intent may be inferred from the fact that procedures that had been approved in previous surveys were deemed substandard for the first time in the 1991 surveys. The FNHRA and ensuing regulations became effective between the August 1990 survey and the September 1991 standard survey. The 1991 surveys of New Paltz were thus the first to be conducted under the new regulatory framework, which required surveyors to rely, more than before, on time-intensive and relatively intrusive investigative procedures, such as observation of residents and interviews with both residents and staff. See 42 C.F.R. Sec. 488.10; 53 Fed.Reg. 22850, 22956 (June 17, 1988). The statutory change clearly undermines the significance of any sudden rise in the number of New Paltz's deficiencies in 1991, insofar as such a rise might be probative of retaliatory motive.
 
 
 32
 Finally, we turn to the question whether the actions taken by DOH were sufficiently unusual to satisfy the heightened evidentiary standard. They were not. This was not a case in which regulatory officials scoured a municipal code to find a forgotten provision passed during the Mexican-American War to trip up a gadfly. The DOH here was carrying out mandatory surveys involving new federal regulations.
 
 
 33
 Moreover, the record indicates that the number of surveyors and the duration of the September 1991 standard survey were not unusually rigorous. For example, the 1988 survey of New Paltz was conducted by ten surveyors on site for five days; the 1989 Survey had seven surveyors on site for three days; and the 1990 survey had six surveyors on site for two or three days. The extended and follow-up surveys were required after Level A deficiencies were found, Survey Protocol at 32-33, and cannot be considered excessive in light of the relevant guidelines, see Survey Protocol at 32 (requiring "expansion" of review and "in-depth" review during extended survey); Survey Protocol at 34 (directing surveyors to "conduct as many survey tasks as needed to determine compliance status" and permitting surveyors to "gather[ ] information related to any requirement").
 
 
 34
 New Paltz thus does not have sufficient evidence of a retaliatory motive to go to a trier of fact on its retaliation claim.
 
 
 35
 We therefore reverse.
 
 
 
 [1]
 New Paltz argues that we lack appellate jurisdiction. However, where the defendant is a public official asserting qualified immunity and the issue appealed concerns whether the facts viewed in the light most favorable to the plaintiff show a violation of clearly established law, a district court's order denying a defendant's motion for summary judgment is an immediately appealable collateral order. See Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); Johnson v. Jones, --- U.S. ----, ----, 115 S.Ct. 2151, 2155, 132 L.Ed.2d 238 (1995); Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). Given our disposition of this matter, our jurisdiction is clear
 
 
 [2]
 There can be no claim that nursing homes are unaware of the likelihood of inspections, see Burger at 702-03, 107 S.Ct. at 2643-44. Similarly, the regulations in question are limited to patient care and thus authorize the surveyors to intrude only in areas related to that care, see id
 
 
 [3]
 New Paltz's claim rests on the assumption that its successful defense of its tube-feeding practice constituted a protected exercise of its First Amendment rights. However, in the cases relied upon by New Paltz, the plaintiff "petitioned the government" by bringing litigation or by cooperating in potential litigation. See Franco v. Kelly, 854 F.2d 584 (2d Cir.1988) (prison inmate alleged retaliation for his cooperation with investigation of inmate abuse); Morello v. James, 810 F.2d 344, 346-48 (2d Cir.1987) (right of access to courts violated where prison inmate's legal research and briefs were confiscated by prison officials); Flaherty v. Coughlin, 713 F.2d 10, 11 (2d Cir.1983) (prison inmate alleged retaliation for his suit against prison officials). The present case is distinguishable. New Paltz never petitioned the government by bringing suit; it merely defended itself in an action brought by DOH
 However, a right to defend oneself against a formal charge without being subjected to retaliation by government officials may be easily derived either from the right to a hearing under the Due Process Clause or from the First Amendment right to petition the government. If those who defend themselves against formal charges may be subjected to harassment by officialdom for doing so, the right to a hearing is clearly of greatly diminished value. Moreover, defending against a formal charge is sufficiently analogous to petitioning the government for retention of the status quo to warrant First Amendment protection against retaliation.
 
 
 [4]
 The heightened standard issue was left open in Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 165-67, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993), which held that particularized factual allegations were not necessary under Fed.R.Civ.P. 8 and 9 to state a claim of municipal liability under Section 1983. Our decision involves no conflict with either Rules 8 or 9, because the standard we apply comes into play only in response to a motion for summary judgment. See Note 6, infra, and accompanying text
 
 
 [5]
 In cases involving allegations of retaliatory arrests, we have held that the existence of probable cause provides qualified immunity to the officer who provides the information for a warrant or persons reporting a crime from a claim that the arrest was for an improper purpose. See Magnotti v. Kuntz, 918 F.2d 364 (2d Cir.1990) (qualified immunity shields officer from retaliation claim where a reasonable officer would believe that the warrant at issue was supported by probable cause); Mozzochi v. Borden, 959 F.2d 1174 (2d Cir.1992) (qualified immunity shields officer from retaliation claim where a reasonable officer would believe that the arrest and prosecution at issue was supported by probable cause). Another decision, however, requires at least some inquiry into the subjective intent of the defendant, see Musso v. Hourigan, 836 F.2d 736, 743 (2d Cir.1988) (Harlow 's objective test does not require a court to "ignore the fact that intent is an element of the relevant ... action.")
 Magnotti and Mozzochi are troubling in that they appear to negate the existence of a retaliation claim involving arrests. If probable cause provides qualified immunity from a retaliation claim, then such a claim can be asserted only in cases in which a false arrest claim can also be made. We do note, however, that Magnotti stressed the lack of particularized evidence of a retaliatory motive in finding that qualified immunity existed. There was a similar lack of evidence in Mozzochi, where the arrest was in response to a threatening communication. In any event, we limit those decisions to arrests and do not extend them to other variations of retaliation claims.
 
 
 [6]
 Ordinarily, a district court's ruling that a genuine dispute of facts material to a claim of qualified immunity exists is not appealable. Johnson v. Jones, --- U.S. ----, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). However, we exercise pendent jurisdiction in the instant matter because the district court's ruling in that regard is intertwined with the issue of the standard to be applied in retaliation cases and review of that ruling is necessary to a meaningful review of the appealable issue of whether the district court applied the proper standard. See Swint v. Chambers Cty., --- U.S. ----, ----, 115 S.Ct. 1203, 1212, 131 L.Ed.2d 60 (1995). Explication of the proper standard in the abstract is clearly far less helpful to the parties or the district court than an application of it in a concrete setting, particularly when we deal with an issue of first impression. Moreover, the facts here are rather typical of retaliation claims, and an abstract explication of the standard by use of hypothetical facts would tread very close to a review of the record itself. The issues thus are intertwined. For similar reasons, meaningful review of the appealable issue of the proper standard requires us to determine whether a material dispute exists, at least in the first case in the circuit to address the former issue