**Rosemary AQUAVIA**

v.

**James GOGGIN and William Goggin, Sr.**

**No. 3:00CV2328(JBA).**

United States District Court,
D. Connecticut.

June 5, 2002.

John R. Williams, Dawne Westbrook, Williams & Pattis, New Haven, CT, for plaintiff.

James Newhall Tallberg, Updike, Kelly & Spellacy, P.C., Hartford, CT, for defendants.

### Ruling on Motion for Summary Judgment [Doc. # 20]

ARTERTON, District Judge.

Rosemary Aquavia, a secretary in the Town of Naugatuck's Building Department, filed this 42 U.S.C. § 1983 suit alleging that James Goggin, the town's personnel director, and William Goggin, Sr., a town burgess, retaliated against her for questioning whether a town job posting was in compliance with state law. Aquavia claims that this inquiry was protected First Amendment speech, and that the defendants unlawfully retaliated against her by giving her a disciplinary notice, inquiring about cutting her position to part time, videotaping her empty office desk while she was out of the office during business hours, and falsely accusing her of misconduct. Additionally, Aquavia asserts a state common law claim of intentional infliction of emotional distress.

The defendants have moved for summary judgment, claiming that the undisputed facts show that they did nothing to violate her constitutional rights. Alternatively, they argue that their actions are protected by absolute immunity (in the case of Burgess Goggin, who is claimed to have been acting in a legislative capacity) and qualified immunity (in the case of James Goggin).

For the reasons set out below, the defendants' motion is granted in part and denied in part. Defendant William Goggin, Sr., is granted summary judgment on all claims against him, and defendant James Goggin is granted summary judgment on all claims except Aquavia's First Amendment retaliation claim regarding the disciplinary notice.

I. Facts [1]

Aquavia has been a secretary in the town's building department for thirteen years. In September of 1999, the town's building inspector, Walter Woods, wanted to hire an assistant.[2] Woods prepared a job posting for the position, which was published in the local newspaper. Aquavia believed that the requirements listed in the job posting might not be in accordance with the Connecticut statutes governing such positions, and on September 29, 1999 she wrote a letter to the Connecticut Building Department raising these issues. She prepared and sent the letter using her office word processor, the town's letterhead, and the office fax machine. Aquavia received a written reply indicating that the requirements listed in the posting more closely fit those required of an assistant building official, rather than an assistant building inspector.

It is undisputed that Aquavia's investigation was outside the scope of her job duties as a secretary, and that no one

1. All facts recited herein are either agreed to in the parties' 9(c) statements, or are separately footnoted.

2. Woods Dep. at 38. While plaintiff's 9(c)(2) statement only agrees "in part" with this fact, the basis for disagreement is "Plaintiff does not have knowledge of who wanted to hire an Assistant Building Inspector." Disagreement with a factual contention in deposition testimony offered in support of summary judgment must be supported by some evidence of the contrary contention, and as there is none, this fact is deemed undisputed.

asked her to investigate the qualifications listed in the job posting. When James Goggin learned of Aquavia's activities using the town's equipment and letterhead, he gave her a disciplinary warning on October 13, 1999, which stated that she was not to use town resources to conduct personal business. The parties dispute whether the warning was written or oral.[3] Aquavia appealed the warning to the Connecticut State Board of Mediation and Arbitration, where it was upheld as valid. Aquavia did not appeal the Board's affirmance, and the parties agreed that the warning would be removed from her file after one year.

Several months later, at the beginning of the 2000 annual budget season, the town faced a budget shortfall, and several departments were considered for budget reductions.[4] James Goggin asked Woods whether he needed a full-time secretary, or whether a part-time secretary would suffice.[5] Woods replied that he needed a full-time secretary, and the issue was not raised again.[6]

On Aquavia's signed time sheet for May 12, 2000 she indicated that she would be working a full day. However, she left the office for approximately an hour to attend a funeral. During this hour, Burgess Goggin went to the building department with a video camera, and from the public area in front of the counter, he videotaped for approximately nine seconds a portion of the office that plaintiff claims included her empty desk, as well as the clock on the wall.[7] Burgess Goggin maintains that he was investigating, in his capacity as a burgess, claims that the building department was mismanaged.

After Aquavia learned that Burgess Goggin had visited the office while she was gone, she changed her time sheet to reflect the actual hours she worked on May 12.[8] On May 30, Burgess Goggin had a meeting with Aquavia about the time sheet change.[9] Aquavia's description of the conversation is that "it wasn't a strong warning or anything like that … it wasn't a stern warning, he was very polite about it …."[10] Aquavia testified at her deposition that she was not disciplined for the altered time sheet incident.[11]

---

3. Defendant claims the warning was oral and later memorialized in a memo. The memo, in fact, has a check mark beside the "oral warning" box, and there is no check next to the "written warning" box. Plaintiff claims that the existence of the memo indicates that the warning was "written."

4. James Goggin Aff. ¶¶ 8–9.

5. James Goggin Aff. ¶¶ 10–13.

6. Woods Dep. at 24–27.
 Plaintiff denies this entire paragraph in her 9(c)(2) statement, but has pointed to no contrary evidence in the record. Plaintiff responds that she "is without sufficient information to agree or disagree" as to the town's budget, and disagrees with defendants' "characterization" of the request. However, given the uncontroverted evidence in the record, these facts are established for summary judgment purposes.

7. Burgess Goggin Aff. ¶¶ 8–12.
 Plaintiff's 9(c)(2) statement denies that Goggin stayed in the public area of the office, in front of the counter, but offers no evidence to the contrary. Plaintiff also claims insufficient knowledge to admit or deny the length of the videotaping, but again offers no evidence to the contrary.

8. Aquavia Dep. II [Ex. B to Doc. # 22] at 115 ("Q: Isn't it true that you changed your time sheet from May 12, 2000, after Burgess Goggin left your office? A: After he left the building, yes.").

9. Aquavia Dep. II at 122.

10. Aquavia Dep. II at 118.

11. Aquavia Dep. II at 121–123.

## II. Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

When deciding a motion for summary judgment, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R.Civ.P. 56(e).

## III. First Amendment Retaliation

"[T]o assess the extent to which a state may regulate the speech of its employees, courts must balance 'the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Morris v. Lindau,* 196 F.3d 102, 109–110 (2d Cir. 1999) (*quoting Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). "Before this balancing test is reached," a court must first assess whether the plaintiff has "initially demonstrate[d] by a preponderance of the evidence that: (1)[her] speech was constitutionally protected, (2)[s]he suffered an adverse employment decision, and (3) a causal connection exists between [her] speech and the adverse employment determination against [her], so that it can be said that [her] speech was a motivating factor in the determination." *Id.* at 110 (*citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Once this burden is met, "the defendant has an opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action 'even in the absence of the protected conduct.' " *Id.*

### A. Protected Speech

 A claim of First Amendment retaliation by a public employee is only established when the plaintiff's speech can "be fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). While the First Amendment applies to speech touching on private concerns, as well, "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment[,]" so this limitation on First Amendment retaliation claims strikes " 'a balance between the interests of the employee, as a citizen, in

commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 146 & 142, 103 S.Ct. 1684 (*quoting Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

Aquavia contends that her September 29, 1999 faxed inquiry to the Connecticut Building Department regarding the requirements listed in a job posting constitutes a matter of public concern. Defendants claim that this inquiry does not qualify under *Connick,* relying on Aquavia's statement in her deposition that she did it "just for my own knowledge." Aquavia Dep. I [Ex. A to Doc. # 22] at 62. If this excerpt from Aquavia's deposition is placed in context, it becomes clear that she was distinguishing between the questioner's inquiry as to whether this was part of her official job duties:

Q: Your job was not to investigate the hiring practices of your department, was it?

A: No.

Q: And your job did not include conducting internal investigations of office staff, did it?

A: That is not included, no.

Q: And your job was not to hire employees, was it?

A: No.

Q: And you were not authorized to use office property to investigate the operations of your office, were you?

A: No. I would have to say, no.

Q: So if it was not part of your job [to] investigate the department's hiring practices, why did you write this September 29, 1999 memo to the Connecticut Building Officials?

A: It was just for my own—just for my own knowledge. Because I have asked—I had also faxed, in a previous administration, a question [seeking] clarification of state statutes for the State Building Inspector.

Aquavia Dep. I at 62. There is no evidence that Aquavia had any personal reason to be concerned about the qualifications of assistant building inspectors in Connecticut, as there is nothing in the record suggesting that she or anyone she knew was planning on applying for such a position. Thus, defendants' contention that Aquavia's inquiry was purely private is unavailing.

Aquavia's investigation of perceived or possible improprieties in the appointment of state officials responsible for enforcing health and safety regulations appears from the record to have been borne out of her general concern that such matters be handled in a proper and legal manner. At oral argument, counsel for Aquavia argued that while Aquavia's query may not be immediately obvious as a matter of public concern, this is due to the restrained and low-key manner in which Aquavia pursued her investigation. The record will no doubt be developed further on this point at trial, but as it stands now and taking all inferences in Aquavia's favor, the Court cannot determine as a matter of law that her inquiry regarding the appointment process and appropriate title and grade for these health and safety officials is not a matter of public concern.

### B. Adverse Employment Action

■ Aquavia may prove an adverse employment action either by presenting evidence of a "classic" adverse employment action, such as discharge, refusal to hire, refusal to promote, demotion, reduction in pay, or reprimand, *Morris,* 196 F.3d at 110, or by showing that "(1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or

normal, not ideal or model, workplace," *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002). Aquavia identifies the following actions of the defendants as retaliatory: (1) the disciplinary warning on October 13, 1999, which stated that she was not to use town resources to conduct personal business or harass fellow employees on town time; (2) James Goggin's inquiry of Walter Woods, asking Woods whether he needed a full-time secretary, or whether a part-time secretary would suffice; (3) Burgess Goggin's videotaping of the Aquavia's empty desk when she was at a funeral; and (4) James Goggin's May 30, 2000 meeting with Aquavia about her time sheet change.

1. October 13, 1999 Disciplinary Warning

Aquavia argues that the October 13, 1999 disciplinary warning, whether written or oral, is a "reprimand" and thus a "classic" adverse employment action under the plain language of *Morris.* The warning, which defendants contend was oral, was memorialized in written form and was placed in Aquavia's personnel file, originally presumably for an indefinite time period, although after Aquavia grieved the warning and lost, it was agreed that the warning would be removed after one year. Although the entire disciplinary process became formalized, as there was a union representative present who signed the written memorialization, defendants argue that nonetheless there were no tangible consequences to the October warning, as Aquavia was not docked any pay and the record does not indicate that she suffered any other concrete deprivation, such as loss of an opportunity for promotion.

*Morris* states that "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and *reprimand."* 196 F.3d at 110 (emphasis added) (*citing Kaluczky v. City of White Plains,* 57 F.3d 202, 208 (2d Cir.1995) and noting that *Kaluczky,* in turn, cites *Rutan v. Republican Party,* 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). While the facts of *Rutan* and other cases cited for this proposition do not encompass allegations of reprimand,[12] *Rutan* is nonetheless instructive. There, the Supreme Court reversed, in part, the Seventh Circuit, which had held that while discharging public employees on the basis of their political affiliation violates the First Amendment, other patronage practices violate the Amendment only when they are the "substantial equivalent of a dismissal," i.e., when they would lead reasonable persons to resign. The Supreme Court disagreed, holding that "promotions,

---

12. The plaintiff in *Kaluczky* alleged that the defendants "curtailed many of his professional responsibilities" by transferring his duties to others and excluding him from important meetings. 57 F.3d at 205–206. *Kaluczky* uses the exact language it is cited for in *Morris:* "Adverse employment actions include discharge, demotion, refusal to hire, refusal to promote, and reprimand." *Id.* at 208. For this proposition, *Kaluczky* cites two cases: *Rutan v. Republican Party,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) and *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir.1994).

The plaintiff in *McCabe* had been transferred to a position with lower eligibility for salary increases, less responsibility and more menial tasks than her old job. The court held that the term "adverse employment action" is "broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands." 12 F.3d at 1563, citing *Rutan* and *Goffer v. Marbury,* 956 F.2d 1045, 1049 n. 1 (11th Cir.1992). The cited portion of *Goffer,* where the adverse action consisted of discharge from employment, is: "The Pickering line of cases protects against not only discharge but also any adverse employment action taken by the employer that is likely to chill the exercise of constitutionally protected speech. *McGill v. Bd. of Education,* 602 F.2d 774, 780 (7th Cir.1979). E.g., refusal to hire, demotion, reprimand, refusal to promote."

transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees," 497 U.S. at 75, 110 S.Ct. 2729, recognizing that "there are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy," *id.*

■ Following *Rutan,* formal reprimands of the sort received by Aquavia in this case can satisfy the requirement of an adverse employment action in the First Amendment retaliation context if they have the power to exert pressure on employees to conform their behavior. An earlier Second Circuit case, *Aebisher v. Ryan,* 622 F.2d 651 (2d Cir.1980), is instructive on this point. There, two teachers spoke to the local press after one was attacked by a student. The principal thought the teachers' statements to the press were inappropriate, and issued each a letter of reprimand. The letters stated that the teachers acted unprofessionally and with poor judgment in discussing the attack with a reporter, and were placed permanently in the teachers' personnel files. After a suit seeking monetary damages and removal of the letter was commenced, the district court granted summary judgment to the school, "largely by belittling the prejudicial effect of the letters of reprimand." *Id.* at 655. The Second Circuit reversed and remanded:

> We remand the matter to the district court so that it may factually determine the practice and procedure relative to the so-called letters of reprimand and the practical effect and consequence of their presence in plaintiffs' employment files. If the facts as found indicate that the letters and Ryan's comments have a chilling effect sufficient to trigger First Amendment inquiry, the district court must then ascertain the facts necessary

for application of the Pickering balancing test. *Id.*

■ The court in *Aebisher* was leery of defendants' protestations that the letters of reprimand were of little force or effect:

> When appellees' counsel urged that contention during oral argument in this Court, he was asked why, if the letters of reprimand had so little meaning and effect, they were not removed from appellants' files, thus obviating the need for this costly litigation. The refusal of the school district to take this simple step indicated to the Court that the presence of the letters in appellants' files might be more prejudicial than appellees were willing to concede.

*Id.* Here, while the record reveals no actual consequence to Aquavia beyond her claims of mental distress arising from the disciplinary notice, the record does reveal that everyone involved treated this disciplinary warning seriously. The matter was memorialized in writing, union representation was obtained and the matter was grieved to the state arbitration board for written opinion. Further, there is nothing to indicate that the warning would not have permanently stayed in Aquavia's personnel file, absent the agreement to remove it. Finally, James Goggin's affidavit suggests that he considered the warning to be of a serious nature: "I have taken no adverse employment action against [plaintiff], except the one oral warning in October 1999 . . . ." James Goggin Aff. ¶ 14.

The formal oral warning memorialized in writing and given to Aquavia by James Goggin constitutes a "reprimand" in virtually any sense of the word. Such a reprimand has the potential to "press state employees . . . to conform their beliefs and associations to some state-selected orthodoxy," *Rutan,* 497 U.S. at 75, 110 S.Ct. 2729, and thus constitutes an "adverse em-

ployment action" under Second Circuit case law.

### 2. Remaining Allegations of Retaliatory Conduct

No reasonable juror could conclude, based on the evidence in the record, that the remaining allegations of retaliatory conduct rise to the level of adverse employment actions. Because they are not "classic" adverse employment actions, they are analyzed under the *Phillips* standard, which requires that "using an objective standard," the jury must conclude that "the total circumstances of [Aquavia's] working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." 278 F.3d at 109. "Incidents that are relatively minor and infrequent will not meet the standard, but otherwise minor incidents that occur often and over a longer period of time may be actionable if they attain the critical mass of unreasonable inferiority." *Id.* "[A] merely discourteous working environment does not rise to the level of First Amendment retaliation." *Id.*

■ James Goggin's inquiry of Walter Woods regarding whether a part-time secretary would suffice resulted in no change whatsoever to the circumstances of Aquavia's working environment: after Woods informed Goggin that he required a full-time secretary, the matter was dropped and nothing has happened since that time. While a jury could conclude that Burgess Goggin's nine-second videotaping of the Building Department's office was a rather dramatic attempt to ferret out wrongdoing, the entire episode amounted, at most, to Burgess Goggin uncovering an impropriety (Aquavia's absence when her signed time sheet indicated her presence) that Burgess Goggin or anyone else could just

as easily have discovered by stopping by unannounced without a video camera. Once this impropriety was brought to the attention of James Goggin, the only result was a discussion about proper office procedures. This is far short of a formal reprimand, such as the October 1999 reprimand discussed above, and effected no change in her working conditions. These alleged incidents, alone or in combination, fall short of being adverse employment actions.[13]

### C. Causal Connection

■ Inasmuch as the October 13, 1999 disciplinary warning is a "reprimand" sufficient to constitute an adverse employment action, Aquavia must establish a causal connection between her protected speech and the reprimand. "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." *Blum,* 18 F.3d at 1010.

■ Aquavia received the October 13, 1999 warning only fourteen days after faxing her inquiry. Additionally, she testified at her deposition that she has previously made her inquiries while at work, using town resources. Aquavia Dep. I at 60–61; Aquavia Dep. II at 50. The parties have identified no evidence showing that during her thirteen-year tenure with the town, Aquavia had ever before been disciplined, either for personal use of town resources or for any other matter. There is ample evidence in the record, however, that Aquavia repeatedly used town resources for tasks that were not part of her job description. In particular, Aquavia used her office word processor to keep logs recording, inter alia, the drinking habits of town employees. Aquavia Dep. II at 49–50. The record shows that these logs were

---

**13.** Inasmuch as the only allegation against Burgess Goggin concerned the videotaping, summary judgment is appropriate for this defendant.

kept over many years, *see, e.g.,* [Doc. # 22] Ex. G (containing entries from 9/20/1994 through 9/30/1997), and that Aquavia sent copies of these logs to several prominent town officials, including current and former mayors and, in particular, Burgess Goggin, *see* Aquavia Dep. I at 92–105. Despite this repeated and open use of town equipment for tasks that were not part of her job description, the record reveals no discipline of any kind until the October 1999 warning issued for Aquavia's faxed inquiry.

In contrast, when Aquavia was found to have incorrectly noted on her time sheet that she would be working all day (when in fact she left the office to attend a funeral), she was not disciplined at all: the only result was a discussion with her supervisor regarding proper timekeeping procedures. Given James Goggin's relatively understated response to what might uncharitably be characterized as deliberate falsification of time records, a jury could reasonably conclude that his more severe response to Aquavia's use of office equipment for her inquiry was based on the content of the inquiry, rather than the process by which Aquavia inquired (i.e., the use of town equipment). From these facts, a jury could reasonably conclude that there is a causal connection between the reprimand and Aquavia's protected speech.

### D. Balancing

Inasmuch as Aquavia can make out the three elements of the *prima facie* case with regard to her allegation that James Goggin issued the October 13, 1999 disciplinary warning in retaliation for her inquiry to the building inspector, the next step is to balance Aquavia's interests in her speech with the town's interest in an orderly workplace. *See Morris,* 196 F.3d at 110; *Heil v. Santoro,* 147 F.3d 103, 109–111 (2d. Cir.1998). In *Heil,* the Second Circuit applied this balancing test by initially determining that the employee estab-

lished the three part test (speech, adverse action, causation), and then providing two methods by which the government could nonetheless escape liability. *Id.* at 109.

■ First, "the government can prevail if it can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities and can persuade the court that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech." *Id. (citing Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion) and *Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir.1995)). This possibility, however, requires that the discipline not actually have been motivated by the protected speech—i.e., the subjective motivation of the government employer must be pure. *See Jeffries,* 52 F.3d at 13 ("Whittled to its core, *Waters* permits a government employer to fire an employee for speaking on a matter of public concern if: (1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption *and not in retaliation for the speech.*") *(citing Waters )* (emphasis added). This exception is inapplicable, given the reasonable inference that Aquavia's discipline *was* motivated by retaliation, as discussed above.

■ The second exception articulated in *Heil* is: "even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." *Id.* at 110 *(citing, inter alia, Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568 and *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1059 (2d Cir. 1993)). "This principle prevents an em-

ployee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct." *Id.* (*citing Waters,* 511 U.S. at 681, 114 S.Ct. 1878 ("An employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements.") (plurality opinion)).

In *Heil,* the plaintiff police officer obtained a confidential memorandum and attached it to an unfair labor charge filed with a state agency. During the course of an investigation, he refused a supervisor's direct order to return to a meeting that he stormed out of, and for that conduct, he was disciplined with a 10 day suspension. The Second Circuit applied this second balancing exception, holding that the town escaped liability because "given the present record, there is no question that Heil would have been disciplined in connection with his September 9 conduct during [the] investigation without regard to his purportedly protected speech," *id.,* noting that Heil admitted in the course of the litigation that he was disciplined " 'as a result of his being found guilty of insubordination.' " *Id.* at 111 (*quoting* Heil's Local Rule 3(g) Statement).

While there is evidence on the record from which a jury could conclude that Aquavia would have been subjected to the same discipline regardless of the content of her speech, there is also evidence from which a jury could reasonably conclude the contrary. Unlike the plaintiff in *Heil,* Aquavia vigorously disputes that the discipline she received resulted from her use of the town equipment, rather than the content of her protected speech, and as set out above there is evidence on the record from which a jury could find in Aquavia's favor on this point. Thus, the second balancing test of *Heil* is not shown to entitle James Goggin to summary judgment.

### E. Qualified Immunity

James Goggin argues that he is nonetheless entitled to qualified immunity, because he has "adduce[d] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ], could conclude that it was objectively unreasonable for [Goggin] to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (*citing Halperin v. Kissinger,* 807 F.2d 180, 189 (D.C.Cir.1986) (Scalia, J., sitting by designation)) (internal quotations omitted).

■■■ This argument focuses principally on the propriety of disciplining employees for non-office use of office equipment. Here, however, the First Amendment violation complained of focuses on James Goggin's state of mind in that he is alleged to have issued the disciplinary warning with the intent to punish Aquavia for speech on a matter of public concern. *See Rutan,* 497 U.S. at 76, 110 S.Ct. 2729 (First Amendment protects a public employee from acts *"intended to punish* her for exercising her free speech rights") (emphasis added) (*quoting* the lower court decision in *Rutan,* 868 F.2d 943, 954 n. 4 (7th Cir.1989)). Thus, the question is not whether a reasonable employer could have concluded the propriety of disciplining Aquavia for using office equipment; instead, it is whether a reasonable employer could have determined that disciplining an employee in retaliation for protected speech was unlawful. *Locurto v. Safir,* 264 F.3d 154, 168 (2d Cir.2001) ("[W]here a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law.") (*citing Crawford–El v. Britton,* 523 U.S.

574, 589, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Sheppard v. Beerman,* 94 F.3d 823, 828 (2d Cir.1996) ("[T]he employer's actual (subjective) motive is not irrelevant in a qualified immunity inquiry" on a First Amendment retaliation claim.)).

In *Blue v. Koren,* 72 F.3d 1075 (2d Cir.1995), the Second Circuit addressed a claim of qualified immunity in which improper motive was an element of the claim and held that the plaintiff in such a case "must proffer particularized evidence of direct or circumstantial facts ... supporting the claim of an improper motive in order to avoid summary judgment." *Id.* at 1084; *accord Hemphill v. Schott,* 141 F.3d 412, 419–420 (2d Cir.1998). Here, as discussed above, the record reveals no other discipline in Aquavia's thirteen-year tenure with the town and repeated, overt use of town resources to keep logs on other town employees. This is sufficient "particularized evidence of ... circumstantial facts ... supporting the claim of an improper motive," *Blue,* 72 F.3d at 1084, and summary judgment on qualified immunity grounds is thus inappropriate.

## IV. Intentional Infliction of Emotional Distress

Aquavia also brings a state tort action for intentional infliction of emotional distress, based on the same conduct discussed above. Defendants argue that they are entitled to summary judgment on this count because Aquavia has not demonstrated that their conduct was sufficiently extreme and outrageous as a matter of law. Plaintiff claims that her allegations are such that the Court should leave the question to the jury.

 Under Connecticut law, to prove intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to inflict emotional distress, (2) that its conduct was extreme and outrageous, (3) that the defendant's con-

duct caused the plaintiff distress and (4) that the distress suffered by the plaintiff was severe. *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986). Conduct is deemed extreme and outrageous where it "exceeds all bounds usually tolerated by a decent society." *Appleton v. Board of Educ. of the Town of Stonington,* 254 Conn. 205, 210, 757 A.2d 1059 (2000) (internal quotations and citations omitted). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Id.* (quoting 1 Restatement (Second), Torts § 46, cmt. d (1965)). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine .... Only where reasonable minds disagree does it become an issue for the jury." *Id.* at 211, 757 A.2d 1059.

 Here, drawing all inferences in favor of Aquavia, the defendant James Goggin issued a disciplinary warning in retaliation for Aquavia's faxing an inquiry to a state official. While this conduct may be unlawful, its unlawfulness does not automatically make it extreme and outrageous. In the employment termination context, other courts have held that " '[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior.' ... The employer's motive for not hiring an employee is not relevant to whether the act was outrageous; it is the act itself which must be outrageous." *Huff v. West Haven Board of Educ.,* 10 F.Supp.2d 117, 123 (D.Conn.1998) (*quoting Parsons v. United Technologies Corp.,* 243 Conn. 66, 89, 700 A.2d 655 (1997)). Here, Aquavia's discipline consisted of a verbal warning reduced to writing. While such a warning may be a sufficient predicate for First

Amendment retaliation liability, it is not, in and of itself, extreme and outrageous.

■ Similarly, Aquavia's remaining allegations with regard to Burgess Goggin and James Goggin must fail in this regard, as well. There is nothing extreme or outrageous about James Goggin's inquiry of Walter Woods regarding whether a part-time secretary would suffice, Burgess Goggin's nine-second videotaping of the Building Department's office, or the May 20, 2000 meeting with James Goggin regarding the falsified time sheets that Aquavia describes as nothing more than a conversation regarding proper office procedures. In performing the threshold inquiry required under *Appleton*, the Court concludes that these allegations are not extreme and outrageous as a matter of law.

## V. Conclusion

For the reasons set out above, defendants' motion for summary judgment [Doc. # 20] is GRANTED IN PART AND DENIED IN PART. Summary judgment is granted in favor of defendant William Goggin, Sr., as to all claims against him, and to defendant James Goggin as to all claims against him except Aquavia's § 1983 First Amendment retaliation claim relating to the issuance of the October 1999 disciplinary warning.

IT IS SO ORDERED.