Jeffrey BARTELS, Plaintiff,

v.

The INCORPORATED VILLAGE OF LLOYD, Harbor, Leland M. Hairr, George M. McCabe, Jean Thatcher, Charles Flynn, Vincent O'Shaughnessy, Renald DiFonzo, Chirstopher Grimm, John Ritter, Jr., Defendants.

No. CV 08–1256(AKT).

United States District Court, E.D. New York.

Sept. 22, 2010.

David Antwork, Campanelli & Associates, Mineola, NY, James M. Maloney, Law Office of James M. Maloney, Port Washington, NY, for Plaintiff.

Michael Anthony Miranda, Kelly Courtney Spina, Matthew J. Mehnert, Miranda Sokoloff Sambursky Slone Verveniotis LLP, Mineola, NY, for Defendants.

## MEMORANDUM AND ORDER

A. KATHLEEN TOMLINSON, United States Magistrate Judge:

Plaintiff Jeffrey Bartels ("Plaintiff") commenced this lawsuit against Defendants Incorporated Village of Lloyd Harbor ("Village"), Leland M. Hairr, George McCabe, Jean Thatcher, Charles Flynn, Vincent O'Shaughnessy, Renald Difonzo, Christopher Grimm and John Ritter, Jr. (collectively, the "Defendants"), pursuant to 42 U.S.C. § 1983, claiming that Defendants suppressed Plaintiff's free speech under the First Amendment by retaliating and conspiring to retaliate against him for his lawful exercise of those rights.[1]

Defendants now move, under Fed. R.Civ.P. 56(c), for summary judgment dismissing all of Plaintiff's claims. DE 42. The Court has considered all of the parties' written submissions as well as the applicable case law. For the reasons set forth herein, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## I. BACKGROUND

The following facts are taken from the parties' Rule 56.1 Statements. Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. New York,* 422 F.3d 47, 50 (2d Cir.2005).

### A. *The Parties*

Plaintiff has been a resident of the Village since 1967. Defs.' Rule 56.1 Stmt. ¶ 5. Defendant Hairr is the Mayor of the Village, having first been elected in 1999. *Id.,* ¶ 6. Defendant McCabe is the Village Highway Superintendent and has been with the Village Highway Department in some capacity for 36 years. *Id.,* ¶¶ 7–8. Defendant Thatcher is an elected Trustee of the Village who also serves as Deputy Mayor. Ms. Thatcher also serves as a civilian police commissioner for the Village. *Id.,* ¶¶ 9–10. Defendant Flynn is the Chief of Police for the Village Police Department.[2] *Id.,* ¶ 12. Defendant O'Shaughnessy is a detective with the Police Department who, prior to March 2009, served as a Village police officer. *Id.,* ¶¶ 13–14. Defendant DiFonzo is a Sergeant with the Police Department and has held this position since July 2005. *Id.,* ¶¶ 15–16. Defendant Grimm is also a Village police officer. *Id.,* ¶ 17. Lastly, Defendant Ritter is a partner of the law firm Humes & Wagner, P.C., and has served as Village Attorney since 1975. *Id.,* ¶¶ 18–19.

---

**1.** Plaintiff initially asserted claims for violations of his right to equal protection under the Fifth and Fourteenth Amendments and state law claims for false arrest and malicious prosecution. However, these claims have subsequently been withdrawn. *See* DE 37, 44.

**2.** Plaintiff disputes Defendant Flynn's position as Chief of Police as Plaintiff claims that Flynn has not received the results of the Chief examination.

## B. *Board Meetings*

The Village, through its board of trustees, holds a monthly meeting to discuss Village business. Defs.' Rule 56.1 Stmt. ¶ 21. Defendant Leland Hairr serves as the Chairman for these meetings. *Id.,* ¶ 22. Residents of the Village are permitted to attend these meetings. *Id.,* ¶ 23. Defendants assert that after all Village business is conducted, time is allotted towards the end of the meeting for public comment where residents must raise their hand and be recognized by the Mayor. Those recognized are generally given three minutes to speak. *Id.,* ¶¶ 24–28. Defendants claim that Plaintiff would at times make comments during the meeting without being recognized. *Id.,* ¶¶ 67–68. Plaintiff recalls first speaking publicly at a board meeting in July 2005 and having spoken at nearly every meeting thereafter. *Id.,* ¶¶ 46, 48. However, Plaintiff maintains that (1) public comment was widely permitted throughout the entire meeting, (2) hand raising was more an informal procedure than a hard and fast rule, and (3) the three minute rule was used on an *ad hoc* basis. Pl.'s Rule 56.1 Stmt. ¶¶ 24–28.

Plaintiff alleges that when he spoke, the board members would laugh, whisper and roll their eyes. Pl.'s Stmt. of Add. Facts ¶ 4. Defendants admit that non-party witness Dr. Coyne confirmed this conduct in his testimony. Defs.' Rule 56.1 Response Stmt. ¶ 4. Plaintiff further asserts that there was little if any respect shown to him by the Board and the Mayor as he was interrupted or cut-off more than half the times he spoke out. Pl.'s Stmt. of Add. Facts ¶ 5. Defendants deny that the Board and Mayor did not treat Plaintiff with respect. Defs.' Rule 56.1 Response Stmt. ¶ 5.

According to the Defendants, the Village began having a police officer attend board meetings sometime in 2003 due to protests that were being conducted over deer culling activities. Defs.' Rule 56.1 Stmt. ¶ 30. Since 2003, a Village police officer has been present at all Village Board meetings. *Id.,* ¶ 37. Plaintiff, however, maintains that other than the times a police presence was required specifically for the plaintiff, officers were not present at the meetings. Pl.'s Rule 56.1 Stmt. ¶ 30. Both sides agree that Plaintiff did not begin attending board meetings until sometime in 2004. Defs.' Rule 56.1 Stmt. ¶ 38; Pl.'s Rule 56.1 Stmt. ¶ 38. The Defendants allege that the police officer attending the board meetings would stand near the doorway of the room to allow for a quick exit in case of an emergency call and that the only reason the officer was near the Plaintiff was because the Plaintiff chose to sit in a seat located nearest the doorway. Defs.' Rule 56.1 Stmt. ¶¶ 39–43. Plaintiff disputes that the meeting room had two doorways and contends that the police presence was specifically due to his attendance. According to the Plaintiff, the Board's action in this regard was inappropriate and intimidating. Pl.'s Rule 56.1 Stmt. ¶¶ 39–43.

## C. *Plaintiff's Efforts to Raise Safety Concerns*

On February 18, 2005, Plaintiff sent a letter to the Mayor and Board outlining safety concerns that he had regarding conditions around the Village. Defs.' Rule 56.1 Stmt. ¶ 44. Plaintiff sent another letter on December 29, 2005, further detailing dangerous conditions in the Village. The Village, through Mayor Hairr, sent Plaintiff a letter on January 23, 2006, acknowledging receipt of his December 2005 letter and informing Plaintiff that his concerns were being referred to the Village Engineer. *Id.,* ¶ 59. Apparently, when a resident makes a complaint to the Village, the Village routes the complaint to the

appropriate department. *Id.,* ¶ 61. In fact, it is uncontested that in response to Plaintiff's previous concern about the speed limit on the Village causeway, the Village examined the issue and lowered the speed limit. *Id.,* ¶ 63. However, Defendants state that many of Plaintiff's concerns about road safety are to be included in a road reconstruction of the causeway. Defs.' Rule 56.1 Stmt. ¶ 64. Plaintiff disagrees. Pl.'s Rule 56.1 Stmt. ¶ 64. Three months later, Plaintiff sent a follow-up letter dated March 20, 2006 regarding the alleged dangerous conditions. *Id.,* ¶ 60.

Plaintiff also telephoned various other Village officials to voice his concerns and make complaints about roadway safety issues. *Id.,* ¶ 50. Likewise, Plaintiff voiced his concerns with local newspapers and reporters assigned to cover the Village. In fact, Plaintiff appeared on a NEWS 12 television broadcast in July 2005 regarding a story on road conditions and again in October 2006 regarding deer culling. *Id.,* ¶¶ 51–54.

According to Plaintiff, Village Clerk Eileen Schulz, whose job was to field complaints from Village residents, testified that Plaintiff's complaints and messages "annoyed her." Pl.'s Stmt. of Add. Facts ¶ 1. Defendants confirm Ms. Schulz's testimony. Defs.' Rule 56.1 Response Stmt. ¶ 1. Further, Plaintiff alleges that in an effort to silence the him, the Village eliminated its entire answering machine system that was set up to field complaints from Village residents. Pl.'s Stmt. of Add. Facts ¶ 2. Defendants deny that the answering machine system was taken down because of the Plaintiff. Defs.' Rule 56.1 Response Stmt. ¶ 2.

## D. *Various Incidents Involving Plaintiff*

### 1. *Officer Muller and Officer Flynn*

The first incident involving Plaintiff occurred at a Board meeting between June 2005 and December 2005 when Police Officer Muller allegedly told plaintiff that if he "got out of control," he would "have no problem arresting" him and driving him out to the Riverhead jail. In addition, at this same meeting, Defendant Flynn purportedly asked Plaintiff if he was going to "be any trouble" during the meeting. Defs.' Rule 56.1 Stmt. ¶¶ 57–58.

### 2. *Incident with Police Officer Grimm*

The next alleged incident occurred at a Board meeting sometime between 2005 and September 1, 2006 where plaintiff was questioning the Village's expenditure of funds for a conference table. Defs.' Rule 56.1 Stmt. ¶¶ 78, 88. Apparently, Police Officer Grimm approached the Plaintiff, placed his hand on his shoulder and threatened to remove him from the meeting. *Id.,* ¶ 78. According to the Defendants, Plaintiff was attempting to speak over the Mayor, was being loud and unruly and was asked to hold his comments before Officer Grimm approached the Plaintiff. *Id.,* ¶¶ 79–82. When Officer Grimm approached the Plaintiff, he placed his hand on Plaintiff's shoulder and asked Plaintiff to sit down until the end of the meeting. *Id.,* ¶¶ 84–85. Plaintiff maintains that he was given the floor by the Mayor and was interrupted by the Mayor because the Board was being questioned about expending $20,000 on a conference table. Further, Plaintiff maintains that the testimony of disinterested non-party witnesses shows that although Plaintiff was no threat, Officer Grimm nonetheless threatened to remove him from the meeting. Pl.'s Rule 56.1 Stmt. ¶¶ 79–80.

### 3. *Incident with Village Highway Superintendent McCabe*

On September 1, 2006, Plaintiff left a message for Defendant McCabe relating to his contention that other residents' complaints had been addressed while Plaintiff's remained open. Defs.' Rule 56.1

Stmt. ¶ 89. Plaintiff acknowledges his statement to McCabe that "not one god damn thing has been done" regarding his concerns, while the concerns of another resident were quickly addressed. Pl.'s Rule 56.1 Stmt. ¶ 90. Plaintiff then drove to Village Hall to speak with Defendant McCabe in person. Defs.' Rule 56.1. Stmt. ¶ 91. Upon entering Village Hall, Plaintiff spoke with Village Deputy Clerk Gail Devol. He then drove his truck from the side of Village Hall to the back of the building and parked his truck by the entrance door for the Highway Department. *Id.,* ¶¶ 92, 94. The parties' recollections of what followed differ substantially.

Defendant McCabe alleges that he came out of the building because he did not wish to encounter the Plaintiff inside the office. *Id.,* ¶ 96. According to McCabe, Plaintiff pointed and yelled at him as he came out of the building. *Id.,* ¶ 97. In response, McCabe claims that he asked Plaintiff to leave the premises, at which point Plaintiff got into his truck while McCabe ran towards the parked cars to get away from Plaintiff's vehicle. *Id.,* ¶¶ 98–99. McCabe recalls Plaintiff stating that he just might "f* *king run you over." *Id.,* ¶ 100. Further, McCabe alleges that he felt fearful of Plaintiff since Plaintiff was a large man and McCabe was not sure what Plaintiff might do. *Id.,* ¶ 109. Village Deputy Treasurer Maureen Dillner and Village Deputy Clerk Gail Devol witnessed the incident and testified that they were concerned for McCabe's safety. *Id.,* ¶ 108.

Plaintiff alleges, however, that McCabe was the one who came outside to encounter him. Pl.'s Rule 56.1 Stmt. ¶ 96. Plaintiff avers that before he said anything, McCabe pointed his finger at the Plaintiff and told him to "get out of here you f* *king freak. I have already called the police." *Id.,* ¶ 97. McCabe actually followed Plaintiff back to his truck according to Plaintiff, and Plaintiff asserts that he never threatened to run McCabe over. *Id.,* ¶¶ 97–100. Plaintiff points to the fact that McCabe's claim that Plaintiff threatened him is notably absent from McCabe's written statement to the police following the incident. *Id.,* ¶ 100. As Plaintiff sees it, what occurred was nothing more than a brief verbal dispute with both sides using expletives. *Id.,* ¶ 101. According to Plaintiff, Village Clerk Eileen Schulz's testimony that she did not witness plaintiff being violent or threatening violence undermines the testimony given by Dillner and Devol. *Id.,* ¶ 108.

Defendants' contend that Schulz called the Village police. Defs.' Rule 56.1 Stmt. ¶ 112. Plaintiff left the scene before the police arrived. *Id.,* ¶ 113. Defendants allege that when Officer Grimm arrive, he spoke to Schulz, Devol and Dillner, all of whom indicated that Plaintiff had been yelling in the parking lot and used profane language. *Id.,* ¶¶ 115–116. McCabe also informed Officer Grimm about the earlier call he had received from Plaintiff, how Plaintiff had threatened to run him over and how he told Plaintiff when he saw him that he did not wish to speak with him. *Id.,* ¶¶ 120–123. Since McCabe indicated that he felt alarmed by Plaintiff, he filed a formal complaint and prepared a written statement. *Id.,* ¶¶ 124–125. Defendants assert that the Village Police attempted to obtain Plaintiff's version of the events by going to his home to speak with him, but Plaintiff was not there because he allegedly had gone to his attorney's office to draft another letter to the Village. *Id.,* ¶¶ 128–129. Thus, the police left a message for Plaintiff to come down to the station to speak about what had occurred. *Id.,* ¶ 130. Several days later, plaintiff received another message, this time directing him to come to the station. *Id.,* ¶ 131.

Plaintiff counters that Officer Grimm testified that the witnesses reported to him

they heard yelling and cursing between the parties. Pl.'s Rule 56.1 Stmt. ¶ 116. Further, the testimony of Schulz diminishes that of Devol and Dillner, Plaintiff argues, because he never threatened to run over McCabe and the alleged threat was omitted from McCabe's written statement, the police blotter and the arrest report. *Id.*, ¶ 118. The "normal procedure" that should have been followed, Plaintiff contends, was to locate and speak to him following the incident. However, Officer Grimm allegedly prepared the police blotter and appearance ticket within one hour and forty minutes of his arrival on the scene. *Id.*, ¶ 128. Plaintiff states that the only attempt the police made to contact him was one message on his answering machine instructing him to come down to the police station. *Id.*[3]

When Plaintiff did go to the police station, he was issued an appearance ticket charging him with harassment in connection with the events that occurred on September 1, 2006. Defs.' Rule 56.1 Stmt. ¶ 133. This charge was ultimately dismissed on February 7, 2007. *Id.*, ¶ 143.

#### 4. Incident with Police Officer O'Shaughnessy

Plaintiff frequently takes photographs of conditions that he perceives to be dangerous in the Village. Defs.' Rule 56.1 Stmt. ¶ 144. One such occasion took place on December 21, 2006, as Plaintiff was taking photos of perceived dangerous conditions at the "Bath House" turn on West Neck Road. Plaintiff was concerned that people were driving while talking on their phones. *Id.*, ¶¶ 148–49. Plaintiff took photos from the side of the road for approximately forty-five minutes until Officer O'Shaughnessy arrived on the scene. *Id.*, ¶ 151.

Defendants allege that the Police Department had received several complaints that Plaintiff was standing on the side of the road pointing something at drivers, which caused them to be frightened and to swerve their vehicles. *Id.*, ¶ 152. Plaintiff asserts that there was only one complaint made, and that was by Village Deputy Clerk Gail Devol. Pl.'s Rule 56.1 Stmt. ¶ 152. Despite the dispute over the number of complaints, it is undisputed that Plaintiff was instructed to leave the scene and stop taking photos and that if Plaintiff did not cease and desist, he would be placed under arrest for disorderly conduct. Defs.' Rule 56.1 Stmt. ¶¶ 153–54. Further, since Plaintiff's car was allegedly illegally parked, Plaintiff was also advised to move it. *Id.*, ¶¶ 155–56. Plaintiff maintains that at that time, Defendant O'Shaughnessy threatened him with arrest for disorderly conduct, threatened to impound his truck and stated "I wonder how many of your tools will still be in your truck when you get back from the impound yard out in Riverhead." Pl.'s Stmt. of Add. Facts ¶ 6.

#### 5. Incident with Sergeant DiFonzo

Sometime in the Spring of 2007, Plaintiff placed a sign on his truck regarding the Village's tree replanting program and parked his truck in the entrance way to a local church, leaving the sign facing the road. Defs.' Rule 56.1 Stmt. ¶¶ 160, 162. Defendants claim that the Police were responding to a complaint lodged by a Village resident that the sign was distracting drivers, causing at least one driver to swerve. *Id.*, ¶ 161. When Sergeant DiFonzo arrived, he informed Plaintiff that the sign was distracting drivers and that it had to be taken down. *Id.*, ¶ 163. Accord-

---

**3.** Plaintiff also alleges that an employee of the Village, Richard Burns, informed him between December 25, 2006 and February 7, 2007, that McCabe asked him to file a false police report against the Plaintiff. Defs. 56.1

Stmt. ¶ 133. However, Burns denies that McCabe ever instructed him to make such a complaint and denies ever making such a statement to the Plaintiff. Defs.' Rule 56.1 Stmt. ¶¶ 140–142.

ing to the Defendants, Plaintiff removed the sign and remained at the location for four hours, taking photos. *Id.,* ¶ 167. In addition, Plaintiff allegedly told DiFonzo that he would drive around with the sign later that day and DiFonzo did not object. *Id.,* ¶¶ 165–66. In fact, Defendants state that later that day, Plaintiff drove to the police station with the sign on his truck and no police personnel said anything to Plaintiff. *Id.,* ¶¶ 168–69.

According to the Plaintiff, the police demanded that he take down the sign based on its content and not for safety reasons. Plaintiff maintains that the Village posts its own signs on the roadways so that safety was not the issue. Pl.'s Rule 56.1 Stmt. ¶ 161. Further, Plaintiff notes that DiFonzo never indicated to him that he was allowed to display the sign elsewhere and Plaintiff never told DiFonzo that he would display the sign later in the day. Nor did Plaintiff re-erect the sign *Id.,* ¶¶ 165–68.

### 6. Letter from Village Attorney Ritter

During a December 2006 Board meeting, Plaintiff offered to clear a public storm drain in the Village that had been overflowing. Defs.' Rule 56.1. Stmt. ¶ 170. Defendants claim that Plaintiff was advised at the meeting to cease and desist from such conduct as the Plaintiff was not covered by the Village's insurance policy. *Id.,* ¶ 171. According to Defendants, there was a serious risk of injury to Plaintiff in clearing the public storm drains since there are times that the drain and storm grates have to be lifted, requiring the use of a crowbar or payloader. *Id.,* ¶¶ 175–77. Defendants further assert that after being advised not to clear the storm drain, Plaintiff continued to do so. *Id.,* ¶ 172. Plaintiff, however, does not recall such a direction being given to him at the meeting.

Pl.'s Rule 56.1 Stmt. ¶ 171. Further, Plaintiff maintains that he was merely removing litter, leaves and debris from the drain along a main road in the Village which was causing severe flooding. *Id.,* ¶ 170. Nevertheless, on March 7, 2007, Village Attorney Ritter sent Plaintiff a letter requiring him to refrain from clearing public storm drains. Defs.' Rule 56.1. Stmt. ¶ 173. Plaintiff understood this letter to be a threat that if he did not immediately cease and desist, the Village would "take any action" against him that was necessary.

### E. Plaintiff's Actions Since the Appearance Ticket

Since receiving the appearance ticket, Plaintiff has continued to place calls to the Village[4] and Village officials, including the Village police, the Mayor, Highway Department foreman John Wickham, and the head of the Village's Permit Review Board, Stefan Herling, to report various concerns or complaints. *Id.,* ¶¶ 179, 181–85, 187. Plaintiff, as recently as 2008, continued to take photos of perceived dangerous conditions in the Village. *Id.,* ¶ 180. Defendants assert that following the appearance ticket, Plaintiff continued to attend and speak at Village Board meetings until 2009. *Id.,* ¶¶ 188, 196. To the contrary, Plaintiff claims that he may have attended hearings where the Mayor and other Board members were not present, but that he has not been to a Board meeting since 2007. Pl.'s Rule 56.1. Stmt. ¶¶ 188, 196; Pl.'s Stmt. of Add. Facts ¶¶ 21–22. The parties agree that since the appearance ticket, Plaintiff has not written a letter to the Village. Pl.'s Stmt. of Add. Facts ¶ 25.

Plaintiff does not dispute that subsequent to the events at issue, he was inter-

---

4. Defendants claim Plaintiff placed 79 calls to the Village to voice complaints and concerns in May 2008 alone. Def. 56.1. Stmt. ¶ 183.

Plaintiff disputes this figure. Pl. 56.1 Stmt. ¶ 183.

viewed for articles about the Village and was featured or quoted in: (1) *Suffolk Life* articles on December 6, 2006 and January 31, 2007; (2) *Long Islander* articles in 2007 as well as February 28, 2008, and July 24, 2008; and (3) a NEWS 12 story on deer culling. Defs.' 56.1 Stmt. ¶¶ 190–194. Further, Plaintiff created a website, updated as recently as October 9, 2009, which purports to further voice his complaints and concerns with regard to road safety and other environmental issues in the Village. *See* DE 52.[5]

## II. DISCUSSION

### A. Standard of Review

In reviewing a motion for summary judgment, the Court is guided by the tenets set forth in Rule 56(c) which provides as follows:

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Doro v. Sheet Metal Workers' Int'l Ass'n,* 498 F.3d 152, 155 (2d Cir.2007); *Castanza v. Town of Brookhaven,* 700 F.Supp.2d 277, 283 (E.D.N.Y. 2010). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Id.* at 157; *Fischl v.*

*Armitage,* 128 F.3d 50, 56 (2d Cir.1997); *Brown v. Parkchester South Condominiums, Inc.,* No. 00–CV–7235, 2006 WL 851789, at *5 (S.D.N.Y. Mar. 31, 2006).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.; see also McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir.2001) ("[e]ven where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor"); *American Steamship Owners Mutual Protection and Indemnity Ass'n v. Lafarge North America, Inc.,* No. 06 Civ. 3123, 2008 WL 4449353, at *5 (S.D.N.Y. Sept. 29, 2008) (same).

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl,* 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled judgment as a matter of

---

**5.** In the Minute Order dated November 13, 2009, the Court agreed to treat Defendants' submission, designated DE 52, as a supplemental briefing on the issue of the newly discovered website belonging to Plaintiff and the issues raised concerning the "chilling effect" on Plaintiff's First Amendment rights. *See* DE 54.

law." Fed.R.Civ.P. 56(e)(2). In other words, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Dobbs v. Dobbs*, No. 06–CV–6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims") (internal quotation marks omitted).

**B.** *First Amendment Claim*

The Second Circuit has explained that the necessary elements to plead a First Amendment retaliation cause of action depend on the facts of the underlying matter. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir.2008). The parties' positions on the appropriate standard differ. Plaintiff relies on a line of cases which hold that for a first amendment retaliation claim to survive summary judgment, a plaintiff must demonstrate that he engaged in speech or conduct protected by the First Amendment and that the speech was a substantial or motivating factor in the actions taken by the defendants. *See, e.g., Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 152 (2d Cir.2006); *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir.2002). Although Defendants adopt the first two prongs of the test discussed by the Plaintiff, they rely on an earlier Second Circuit case which added a third component to the test. Defendants contend that to prevail on a claim of retaliation, a party must prove: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First

Amendment right." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir.2001).

This Court recognizes that certain First Amendment retaliation cases impose the additional "chilling" requirement. Indeed, chilling is a component required in cases where a plaintiff states no harm independent of the chilling of speech. *See Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir.2004). However, where retaliation is alleged to have caused an injury separate from any chilling effect, (e.g., a job loss or demotion), the "chilling" element is not necessary to state a claim. *See Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir.2005). Here, Plaintiff asserts no injury separate from any chilling effect, and thus, the "chilling" element is a necessary component of the claim.

However, Plaintiff also points to cases in this Circuit which have held that in situations involving criminal prosecutions, "if a plaintiff demonstrates a lack of probable cause, there is no separate chilling requirement." *Genia v. New York State Troopers*, No. 03–CV–870, 2007 WL 869594, at *23 (E.D.N.Y. Mar. 20, 2007). Plaintiff argues that there was a complete lack of probable cause for charging him with harassment regarding the incident with Defendant McCabe. Pl.'s Mem. at 14–17. Probable cause is an objective inquiry and is determined by looking to the facts known to the arresting officer at the time of the arrest. *Finigan v. Marshall*, 574 F.3d 57, 61–62 (2d Cir.2009); *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir.2006). Accordingly, probable cause exists when, pursuant to the totality of the circumstances, the officer had "knowledge of, or reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be ar-

rested." *Zellner v. Summerlin,* 494 F.3d 344, 368 (2d Cir.2007).

The actual violation plaintiff was charged with was harassment in the second degree under subsection 2 of the applicable statute. Pursuant to N.Y. Penal Law § 240.26:

A person is guilty of harassment when, with the intent to harass, annoy or alarm another person . . .

2. He or she follows a person in or about a public place or places."

As noted above, the parties' versions of the facts surrounding the encounter between Plaintiff and Defendant McCabe vary greatly. The testimony and the Rule 56.1 Statements demonstrate that there is a material issue of fact whether Plaintiff "followed" Defendant McCabe in or about a public place. As a result, there is a genuine question of fact whether probable cause existed to charge the Plaintiff with harassment.

Plaintiff claims that Defendant McCabe came outside the building and told him to "get out of here" and, after a brief argument that lasted only a couple of minutes, with both parties using obscenities, Plaintiff left. Defendant McCabe testified that he told Plaintiff to "get out of here" ten times. *See* Decl. of Adam I. Kleinberg in Supp. of Defs.' Mot. for Summ. Judg. ("Kleinberg Decl."), Ex. F at 100. However, this fact is not found in Defendant McCabe's sworn statement given to the Village Police. *See* Kleinberg Decl., Ex. AA. When Defendant Grimm arrived on the scene, McCabe told him that he and the plaintiff "both had an argument in the parking lot for a couple of minutes and then Mr. Bartels sped off." *See* Kleinberg Decl., Ex. K at 45. Absent from the testimony of Defendant Grimm and the subsequent police reports are any indication that Plaintiff "followed" McCabe or refused in any way to leave.

Defendant Grimm also interviewed Dillner, Schulz and Devol in addition to Defendant McCabe regarding the incident they all witnessed. According to an Affidavit provided by Devol almost two years after the incident, McCabe told Plaintiff to "get off the property" 3–5 times. *Id.,* Ex. Z, ¶ 9. In another Affidavit provided by Dillner, McCabe asked Plaintiff to leave about 3–4 times while Plaintiff was yelling. *Id.,* Ex. Y, ¶ 8. However, both women acknowledge that they declined to fill out a contemporaneous statement after being asked to do so by Officer Grimm at the time of the incident. The accounts set forth in their affidavits were provided years later. Additionally, Officer Grimm did not testify that Dillner or Devol ever told him that Plaintiff was directed to get off the property numerous times. Officer Grimm also acknowledges that he did not receive Plaintiff's version of the incident before charging the Plaintiff, although he went to Plaintiff's house to get his interpretation. *Id.,* Ex. K at 62. An officer's "failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Panetta v. Crowley,* 460 F.3d 388, 396 (2d Cir.2006). Even if Plaintiff had disputed the witnesses' version at the time of the incident, conflicting versions alone do not defeat probable cause. *See Curley,* 268 F.3d at 70 ("Although a better procedure may [be] for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him.").

As noted above, Plaintiff has created a material question of fact as to whether he "followed" Defendant McCabe in the first instance and whether his actions were sufficient to warrant a charge of harassment. This Court cannot conclude at this time, as a matter of law, that Officer Grimm had probable cause to charge Plaintiff. A trial

is necessary to flesh out the allegations on both sides here. Accordingly, with regard to Plaintiff's claim of retaliation supported by the evidence of the harassment charge, the Plaintiff may not need to prove chilling. However, with regard to Plaintiff's claim of retaliation supported by the other purported actions of Defendants, the chilling element will still need to be satisfied.

### 1. Interest Protected by First Amendment

■■■ Plaintiff avers it is beyond dispute that by speaking out, raising concerns and complaints at public Village meetings, writing letters, and calling officials, he has clearly engaged in speech and conduct protected by the First Amendment. Pl.'s Mem. at 4–5. Defendants do not present an argument to the contrary. Indeed, this Circuit has held that the right to complain to public officials is conduct protected by the First Amendment. *See Dougherty,* 282 F.3d at 91; *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194–95 (2d Cir. 1994). Further, the rights incorporated in the First Amendment include the right to be free from retaliation for exercising these rights. *Puckett v. City of Glen Cove,* 631 F.Supp.2d 226, 240 (E.D.N.Y.2009). Accordingly, the conduct and speech at issue here, namely, raising concerns and complaints involving the Village, is activity protected by the First Amendment.

### 2. Defendants' Actions

Defendants claim Plaintiff cannot establish that the allegedly improper actions, whether viewed individually or collectively, were the result of Plaintiff's exercise of his First Amendment rights. Defs.' Mem. at 4. Plaintiff, however, maintains that Defendants despised and condemned him due to his persistent complaints and outspokenness against the Village and that they took extreme adverse actions against him. These actions consisted of harassment, threats, intimidation and the issuance of a trumped-up formal charge of harassment, all in retaliation for his exercise of his First Amendment rights. Pl.'s Mem. at 5. At a minimum, Plaintiff argues that based on the testimony of disinterested non-party witnesses, there is a genuine issue of fact regarding the defendants' retaliatory motives and actions. *Id.* at 6. The Court agrees.

■■■ This Circuit has held that "[s]pecific proof of improper motivation is required in order for plaintiff to survive summary judgment." *Curley,* 268 F.3d at 73 (citing *Blue v. Koren,* 72 F.3d 1075, 1082–83 (2d Cir.1995)). Specifically, "the plaintiff must proffer particularized evidence of direct or circumstantial facts ... supporting the claim of an improper motive in order to avoid summary judgment." *Blue,* 72 F.3d at 1084; *see also Abel v. Morabito,* 04 Civ. 7284, 2009 WL 321007 at *2 (S.D.N.Y. Feb. 10, 2009) ("Circumstantial evidence such as temporal proximity between Plaintiff's speech and the act in question, or direct evidence such as comments by the defendants, may suffice to meet this [element]."). However, "the particularized evidence of improper motive may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Id.*

■■■ The Plaintiff has put forth direct and circumstantial evidence that a jury could find supports Plaintiff's argument that an improper motive existed. For example, Plaintiff alleges that before one of the Board meetings he attended in 2005, Officer Muller told him that if he "got out of control," he would "have no problem arresting" him and Defendant Flynn asked him if he was going to "be any problem" at the meeting. *See* Kleinberg Decl., Ex. D at 151–52. Further, during the monthly

Village board meetings, Plaintiff claims that the police presence at the meetings was specifically directed at him and was an attempt to intimidate him. Non-party witness and former Police Commissioner Bernard Welsh testified that the Village Board members were visibly annoyed with Plaintiff's questions at the meetings and that the Defendants, including Hairr, Thatcher and Schulz asked for police to be present specifically because of the Plaintiff. *See Id.,* Ex. R at 24–29, 81–85. Non-party witness and Village resident Chris Cornetta also testified that the police officer present at the meetings was right next to the Plaintiff and that the police presence in general was overwhelming, inappropriate and intimidating. *See id.,* Ex. M at 27, 59–62.

Plaintiff further asserts that because of his questioning the Board regarding the purchase of a $20,000 conference table at one of these meetings, Officer Grimm approached him, placed his hand on Plaintiff's shoulder, told Plaintiff to sit down and threatened to remove Plaintiff from the meeting. Non-party witness, former Village Trustee and current chief surgeon for the Suffolk County Police Department, Dr. Scott Coyne, corroborated these assertions and testified that after the Mayor told the Plaintiff to "stop talking right now," Officer Grimm, who was looking down at the Plaintiff, put his hand on the Plaintiff's shoulder and told him that the "Mayor asked you to stop speaking." *Id.,* Ex. Q at 79–81. Dr. Coyne further testified that the "cop was dressing him down" and told Plaintiff "I will have you removed." *See id.,* Ex. Q at 82–84.

Further, a reasonable jury could also conclude that the incidents involving Officer O' Shaughnessy in connection with the taking of photos of drivers on West Neck Road and Officer DiFonzo's directing Plaintiff to take down the sign on his truck were acts motivated by Plaintiff's speech.

In both instances, Plaintiff was told to refrain from certain actions. According to Plaintiff, Officer O'Shaughnessy threatened to arrest him for disorderly conduct and to impound his car. Plaintiff says O'Shaughnessy told him "I can make this easy for you or I can make this hard for you." *See id.,* Ex. D at 71–72. In addition, Officer DiFonzo apparently ordered the Plaintiff to remove the sign on his truck within a half-hour of its erection. *Id.,* Ex. D at 134. Although Defendants argue that in both instances, the actions of the officers were in response to complaints by Village residents, Plaintiff has proffered sufficient conflicting information to raise potential issues of fact from which a jury could find that the actions of the officers were based on an improper motive.

Finally, the incident involving Defendant McCabe and the resulting appearance ticket charging Plaintiff with harassment prompts other material issues of fact which cannot be resolved on summary judgment. Accordingly, based upon the testimony of Plaintiff, supported by non-party witnesses, this Court finds that questions of fact exist from which a jury could reasonably conclude that the Defendants' actions may have been improperly motivated by Plaintiff's protected speech. Therefore, summary judgment is precluded in these circumstances.

### 3. Chilling Effect

Defendants argue that even if their actions were somehow motivated by a desire to retaliate against Plaintiff for exercising his First Amendment rights, Plaintiff is unable to show that his rights were chilled in any way. *See* Defs.' Mem. at 15–17. Plaintiff counters that he has satisfied the chilling requirement based upon his significant change in behavior, or, at the very least, he has offered sufficient evidence to raise a question of fact whether his speech has been chilled. *See* Pl.'s Mem. at 20–22.

To meet this element, "a plaintiff must show ... that his First Amendment rights were 'actually chilled.'" *Curley,* 268 F.3d at 73 (quoting *Davis v. Vill. Park II Realty Co.,* 578 F.2d 461, 464 (2d Cir.1978)). According to the Supreme Court, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Thus, "[w]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley,* 268 F.3d at 73; *see also SEIU/ AFL–CIO v. Rowland,* 221 F.Supp.2d 297, 343 (D.Conn.2002) ("If the plaintiff continues to engage in the protected speech that allegedly motivated unconstitutional retaliation, then it failed to establish an actual chilling of its speech.").

It is undisputed that Plaintiff continues to place calls with Village officials and the Village Police to report his various concerns and complaints. Plaintiff also continues to take photos of perceived dangerous conditions in the Village. Moreover, Plaintiff has created a website to further voice his concerns and complaints. Plaintiff does not dispute that during and after the alleged retaliatory acts of Defendants, he has been featured or quoted in the *Suffolk Life,* the *Long Islander* and on NEWS 12. Despite these expressions of free speech, Plaintiff asserts that he stopped attending Village Board meetings in 2007 and has ceased writing letters to the Village since the harassment charge. Defendants contest the year in which Plaintiff last attended Board meetings but acknowledge that Plaintiff has not written to the Village since the harassment charge. Based on the above facts, the Court finds that Plaintiff has produced some evidence of changes in Plaintiff's behavior. To that extent, Plaintiff has raised a question of material fact as to whether his First Amendment rights were actually chilled. *Compare Abel,* 2009 WL 321007, at *4 (holding that plaintiff's affidavit that he stopped writing his column in the Westmore News because of defendant's actions satisfied chilling element at summary judgment stage) *with Curley,* 268 F.3d at 73 (finding no chilling where plaintiff continued his 1994 mayoral campaign despite plaintiff's charge that he was arrested in retaliation for his comments made during the 1993 mayoral campaign); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 120 (2d Cir.1995) (finding no chilling where plaintiff continued to publish his newsletter).

Further, the Second Circuit in *Spear v. Town of W. Hartford,* 954 F.2d 63 (2d Cir.1992) found no chilling where plaintiff continued to write criticizing editorials in the same manner as before a lawsuit was filed against him. *Spear,* 954 F.2d at 67. The court, in reaching its determination, indicated that the plaintiff in that case did not claim that he had "toned down" his writings. *Id.* In the instant case, although Plaintiff has advanced his First Amendment rights in certain forums, there is factual support for Plaintiff's contention that he has ceased using other forums and methods. Accordingly, this Court finds that Plaintiff has made a sufficient proffer of actual chilling to raise an issue of fact whether his speech/First Amendment rights were actually chilled. Summary judgment is therefore not warranted at this juncture.

### C. *Conspiracy Claim*

Defendants argue that Plaintiff's conspiracy claim under 42 U.S.C. § 1985 fails since those individuals who may be in political or philosophical opposition to and are outspoken critics of the government are not a cognizable class. *See* Defs.' Mem. at 17–18. In response, Plaintiff claims that due to a proofreading error, he mistakenly alleged his conspiracy claim

under § 1985 rather than under § 1983. Plaintiff maintains that this error was clear to opposing counsel as § 1985 speaks only to conspiracies among private actors based upon racial animus whereas § 1983 allows a plaintiff to assert a conspiracy claim against state actors who deprive a person of any right, privilege, or immunity secured by federal law, and does not require racial or any class based animus. *See* Pl.'s Mem. at 23. Thus, Plaintiff requests in his motion papers that the Court allow him an opportunity to amend the Complaint to reflect the intended statute, 42 U.S.C. § 1983. *Id.* Even if the Court were to grant such relief, Plaintiff still cannot survive summary judgment on his conspiracy claim.

The elements of a § 1983 conspiracy are: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999). However, before the Court can even address the elements of a Section 1983 conspiracy, Plaintiff must get past the "the first step of analysis" regarding a conspiracy claim. *See Varricchio v. County of Nassau*, 702 F.Supp.2d 40, 62 (E.D.N.Y. 2010) (quoting *Farbstein v. Hicksville Pub. Library*, 254 Fed.Appx. 50, 50–51 (2d Cir. 2007)) (affirming dismissal of conspiracy complaint "at the first step of analysis" because complaint made reference only to employees of same corporation).

Under the intra-corporate conspiracy doctrine, officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other. *See Broich v. Incorporated Village of Southampton*, 650 F.Supp.2d 234, 246–47 (E.D.N.Y.2009); *Rini v. Zwirn*, 886 F.Supp. 270, 292 (E.D.N.Y.1995) ("Intracorporate immunity has also been extended to the context of conspiracies between a public entity and its employees."); *accord Cameron v. Church*, 253 F.Supp.2d 611, 623 (S.D.N.Y. 2003); *Quinn v. Nassau County Police Dep't*, 53 F.Supp.2d 347, 359–60 (E.D.N.Y. 1999). Here, the Individual Defendants— Mayor Leland Hairr, Highway Superintendent George McCabe, Trustee and Deputy Mayor Jean Thatcher, Village Attorney John Ritter, Jr., Chief of Police Charles Flynn, and Police Officers Vincent O'Shaughnessy, Renald DiFonzo, Christopher Grimm—were all officers, agents, and employees of a single municipal entity, the Village of Lloyd Harbor. In fact, in the Complaint, Plaintiff asserts that

> [a]t all relevant time mentioned herein, defendants HAIRR, McCABE, THATCHER, FLYNN, O'SHAUGHNESSY, DIFONZO, GRIMM, and RITTER, were all employees, officials and/or officers of the Village of Lloyd Harbor and as such, were authorized to review and act upon village policy and procedure, and properly enforce and apply the law and Village Code.

Compl. ¶ 167. As such, these Individual Defendants are "legally incapable of conspiring with each other." *Varricchio*, 702 F.Supp.2d at 62. Accordingly, the Section 1983 conspiracy claims against the Individual Defendants are barred by the intracorporate conspiracy doctrine.[6]

---

**6.** The Court notes the existence of an exception to the intra-corporate conspiracy doctrine, which depends on whether the individual defendants were acting within the scope of their official duties or pursuing independent personal interests. *See Nassau County Employee "L" v. County of Nassau*, 345 F.Supp.2d 293, 305 (E.D.N.Y.2004). In the instant case, none of the allegations against the Defendants can be construed as acts taken for independent personal interests. To the contrary, all the acts alleged against the De-

## D. *Qualified Immunity*

██ Defendants argue that the Individual Defendants are entitled to qualified immunity from liability for damages related to their performance of discretionary official functions.[7] *See* Defs.' Mem. at 23–24. Plaintiff counters that based on the aggregate of testimony and evidence, the actions of the Defendants violated clearly established First Amendment rights and that it was objectively reasonable for defendants to know their conduct violated such rights. *See* Pl.'s Mem. at 27–28.

██ "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "If the right is so generalized that its application in the factual context of the case is subject to doubt, the immunity defense may bar action against the official." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir. 1991). Therefore, the constitutional right and relevant law the officials are alleged to have violated must be "clearly established in a more particularized, and hence more relevant, sense." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

██ However, "[e]ven when a plaintiff's federal rights are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified or good faith immunity might still be available as a bar to plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky,* 929 F.2d at 925. Because qualified immunity is an affirmative defense, defendants bear the burden of showing the objective reasonableness of the acts in question. *Tellier v. Fields,* 280 F.3d 69, 84 (2000).

██ First Amendment law has clearly established that a person's First Amendment rights include the right of free speech and the ability to lawfully exercise that right without being retaliated against. *See Russell v. Coughlin,* 910 F.2d 75, 78 ("[I]t is sufficient if decisions of the Supreme Court or of the appropriate circuit have defined the contours of the right with reasonable specificity."). Defendants do not challenge this premise. Although this fact alone does not negate the qualified immunity defense, the Court finds that in the specific circumstances of this case, the resolution of the qualified immunity defense involves disputed factual questions as to the objective reasonableness of the Defendants's actions. Whether it was Plaintiff's encounters with Officers O'Shaughnessy, DiFonzo and Grimm, or Plaintiff's dispute with Highway Superintendent McCabe, or Plaintiff's interactions with Mayor Hairr and Trustee Thatcher at Board meetings, or Plaintiff's receipt of a letter from Village Attorney Ritter, there are genuine issues of fact to be resolved regarding the basis for the actions taken by Defendants. Accordingly, these factual issues preclude any determination, at this juncture and as a matter of law, that defendants are entitled to qualified immunity. These issues therefore, remain for trial.

fendants were acts performed in their official duties as mayor, police officer, etc.

**7.** The defense of qualified immunity is unavailable to the Village. *See County of Sacra-* *mento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (noting that qualified immunity is unavailable "in an action against a municipality").

## III. Conclusion

For all the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to the conspiracy claim and is DENIED as to the § 1983 First Amendment claim.

The parties are directed to participate in a telephone conference with the Court to discuss scheduling issues on October 20, 2010 at 11:00 a.m. Plaintiff's counsel is requested to initiate the call to Chambers with counsel for all parties on the line.

**SO ORDERED.**